**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF NEW YORK**

In re:

STEWART ADLER,

　　　　　　　　　　　　　　　Debtor.

Case No. 8-04-84807-reg

Chapter 7

---

LISA NG and CHARMING TRADING
COMPANY,

　　　　　　　　　　　　　　　Plaintiffs,

　　　　　　-- against --

STEWART ADLER,

　　　　　　　　　　　　　　　Defendant.

Adv. Pro. No. 05-8559-reg

---

## <u>DECISION AFTER TRIAL</u>

　　　　Before the Court is the issue of whether the Plaintiffs, Ms. Lisa Ng ("Ms. Ng") and a

Hong Kong corporation of which she was the principal, Charming Trading Company

("Charming Trading"), have proven by a preponderance of the evidence four objections to

discharge against Defendant Stewart Adler (the "Debtor" or "Defendant"), the principal and alter

ego of five Corporations: J.U.N.K. Jeanswear Corporation ("J.U.N.K."), Just Jeanswear

Corporation ("Just I"), Just Jeanswear Corporation II ("Just II"), Just Jeanswear Corporation III

("Just III") and Seruchi Jeanswear Corporation ("Seruchi") (individually, referred to as a

"Corporation," and collectively as the "Corporations").  This Court previously issued a ruling

(the "Piercing Ruling") piercing the Corporations' veils.  In accordance with New York's veil-piercing doctrine, the Piercing Ruling found the Corporations to be the Debtor's alter egos and the Debtor liable for their debts.  This Decision after Trial (the "Instant Decision") concerns the application of §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5)[1] of the Bankruptcy Code (the "Code")[2] and the consequences of the Court's earlier determination that the Corporations are, and in fact always were, the Debtor's alter egos.

The first consequence of the Piercing Ruling arises under § 362(a)(1).  As the Debtor and the alter ego Corporations were at all relevant times one and the same entity, the automatic stay in § 362(a)(1) foreclosed any judicial action against the Debtor and the Corporations alike upon the Debtor's filing of his individual bankruptcy petition on July 28, 2004.  Consequently, to the extent any prepetition judicial action against the Corporations continued into the post-petition period, that proceeding violated § 362(a)(1) and was void as a matter of law.  Here, since the decision of the New York Supreme Court (the "State Court Decision") finding the Corporations' liable to the Plaintiffs for $2,025,849.97 was issued post-petition, it is such a nullity.  Its findings regarding the Corporations liability therefore lack any legal effect.

Second, the Corporations' status as the Debtor's alter egos is part of this Court's § 727 analysis because, as a result of the alter ego finding, the Debtor's failure to disclose information regarding the assets and transactions of the Corporations was simultaneously a failure to disclose the assets and transactions of the Debtor.  By definition, an alter ego corporation possesses no independent volition.  Consequently, since the Debtor's Corporations were found to have been such prepetition alter egos, the Debtor always remained inseparable from those five corporate

---

[1]    The Plaintiffs' also asserted a claim under § 523(a)(2)(A) of the Code, but for the reasons explained herein, that section will not be addressed in the Instant Decision.

[2]    The specific provisions of the Bankruptcy Code, set forth in 11 U.S.C. §§ 101–1532 inclusive, are referred to in this decision as "section _" or "§ _" unless otherwise noted.

fictions.  The actions and property of the Corporations were thus the actions and property of the

Debtor, and it was incumbent upon the Debtor to disclose details regarding the Corporations'

conduct, assets, and records in his individual bankruptcy case.  When he failed to do this and

instead concealed the Corporations' assets, the Debtor improperly "concealed" his own assets, in

violation of § 727(a)(2)(A).  When the Debtor failed to justify the Corporations' failure to

preserve any "recorded information," the Debtor contravened § 727(a)(3) by making it

impossible to ascertain his own business transactions.  When the Debtor could not explain how

the Corporations' $2.2 million in factor financing had been dissipated, the Debtor failed to

explain the loss of assets sufficient to meet his liabilities under § 727(a)(5).  Finally, when he

omitted his income and the Corporations' assets and liabilities from the petitions and schedules

filed with this Court, the Debtor gave false oaths regarding "property of the debtor," running

afoul of § 727(a)(4)(A).

Along with these Corporation-related transgressions, the Debtor also misrepresented his

personal income and mischaracterized his personal assets and liabilities throughout this

proceeding.  Even in the absence of the Piercing Ruling, these personal misdeeds violated his

statutory obligations as an individual to accurately describe his business transactions and true

financial condition.  Were he not his Corporations' alter ego, the Debtor's action in this

bankruptcy would have still violated § 727(a) and rendered him ineligible for a discharge.[3]

In sum, as a result of two distinct failures by this Debtor—the first, to account for the

property and actions of each alter ego Corporation, and the second, to fully disclose his

individual assets and material business activities—this Court will deny him a discharge pursuant

to §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

---

[3]        The Plaintiffs' also asserted a claim under § 523(a)(2)(A) of the Code.  *See* Discussion, section I.

## FACTS

Prior to filing, the Debtor "was the sole officer, director, and shareholder" of the five Corporations, all of which "were engaged in the business of importing and selling wholesale jeans and other garments into the United States." *Ng. v. Adler (In re Adler)*, 467 B.R. 279, 282 (Bankr. E.D.N.Y. 2012); Tr. 9/20/10 at 59:13–25, 1, ECF No. 59, Adv. Pro. No. 05-8559; Tr. 9/22/10 at 82:5–9, ECF No. 63, Adv. Pro. No. 05-8559. Through the Corporations, the Debtor worked with the Plaintiffs, as the Corporations' agent, to import garments from Hong Kong to the United States. *In re Adler*, 467 B.R. at 282–83; Tr. 9/20/10 at 51:22–24, 169:7–8, 172:17–19; Pls.' Ex. 6. Eventually this relationship changed, and the Plaintiffs "used their own credit to purchase merchandise and pay shipping costs" on behalf of a Corporation. *In re Adler*, 467 B.R. at 283; Pls.' Ex. 7; Tr. 9/20/10 at 174:25–175:1; Tr. 9/21/10 at 178:11–16, ECF No. 61, Adv. Pro. No. 05-8559; Tr. 11/17/10 at 69:21–25, 70:9–10, 101:12–16, ECF No. 63, Case No. 8-04-84807; Tr. 12/14/10 at 15:17–18, 30:16–17, 21–24, ECF No. 68, Adv. Pro. No. 05-8559.

The Debtor financed the Corporations' operations by means of factor financing, such that the Corporations' manufacturers were to be paid directly by a Corporation or by the factor to which a Corporation had sold its accounts receivable. Tr. 9/20/10 at 50:10–13, 21–23, 164:6–16, 186:22–24; Tr. 9/22/10 at 36:19–25, 51:22–24; Tr. 11/16/10 at 51:22–25, ECF No. 61, Case No. 8-04-84807. Over time, from the sales of accounts receivable, the Corporations were paid approximately $3.3 million by the factors. Tr. 11/16/10 at 20:5–7; Pls.' Exs. 43–50; Tr. 9/21/10 at 137:22–25; Tr. 9/22/10 at 48:2–6. After the Plaintiffs were paid $1.1 million, $2.2 million remained; this sum was sufficient to satisfy the Plaintiff's outstanding invoices. Tr. 9/21/10 at 77:12–17, 138:14–19. The Corporations, however, did not pay the Plaintiffs in full for the merchandise purchased on their behalf. *In re Adler*, 467 B.R. at 283; Tr. 9/20/10 at 178:13–16;

Tr. 9/21/10 at 6:2, 26:22–24, 30:24–25, 32:16; Tr. 11/17/10 at 35:4–14.  As a result, the

Plaintiffs defaulted on their obligations to the Hong Kong manufacturers and were sued in Hong

Kong's courts.  *In re Adler*, 467 B.R. at 283; Pls.' Ex. 27; Tr. 12/14/10 at 66:22–24; Tr. 2/3/11 at

96:21–24, 116:13–15, ECF No. 71, Case No. 8-04-84807.  Sometime afterward, Ms. Ng fled to

the United States.

## PROCEDURAL HISTORY

### I.       Proceedings in United States Bankruptcy Court

On July 28, 2004, the Debtor filed a voluntary Chapter 7 petition (the "Petition"),

identifying his debts as business in nature.  Dr.'s ch. 7 Pet., July 28, 2004, ECF No. 1, Adv. Pro.

No. 05-8559.  A notice of discovery of assets was filed by the chapter 7 trustee, and a claims bar

date was set for January 16, 2009.  Only two proofs of claim were filed: the first, for $3,518.87,

was filed on November 5, 2008 by the New York State Department of Tax and Finance; and the

second, for $2,025,841.91, was filed by the Plaintiffs after the bar date, on February 27, 2009.[4]

Proof of Claim No. 1, Nov. 5, 2008, Docket No. 04-84807; Proof of Claim No. 2, Feb. 28, 2009,

Docket No. 04-84807.

The Plaintiffs commenced this adversary proceeding on April 25, 2005, seeking to have

the Corporations' putative debts to the Plaintiffs deemed nondischargeable under § 523(a)(2)(A),

(a)(4), and (a)(6) and to bar the Debtor's discharge per § 727(a)(2)(A), (a)(3), (a)(4)(A), and

(a)(5).  After extensive proceeding in this Court and the district court on appeal, the Plaintiffs

and the Debtor (collectively, the "Parties") agreed that resolution of the Plaintiffs' alter ego

allegations was a threshold issue in this case because it would establish the Debtor's liability for

the Corporations' debts, and that issue should be decided first.  During seven non-consecutive

---

[4]       As the Court previously explained, the fact that the Plaintiffs' claim was filed after the bar date is not fatal
to their standing as a creditor in this case.  *In re Adler*, 467 B.R. at 285 n.4.

days of trial, commencing on September 20, 2010, the Court received numerous exhibits and heard testimony by three persons: the Debtor; the Debtor's accountant, Mr. Michael Portnoy ("Mr. Portnoy"); and Ms. Ng ("Alter Ego Trial").

On March 2, 2012, this Court issued the Piercing Ruling finding that the Plaintiffs "have sustained their burden of piercing the corporate veil to hold the Debtor liable for the debt of his corporations." *In re Adler*, 467 B.R. at 282.  The Piercing Ruling resolved neither the dollar amount of the Debtor's liability nor the viability of the Plaintiffs' claims under § 523(a) and § 727(a). *Id.* & n.1.  On April 16, 2012, counsel for the Parties appeared before this Court at a pretrial conference at which it was determined that "phase two" of these proceedings should involve a determination as to whether the Debtor's liability to the Plaintiffs, whatever that liability was determined to be, is non-dischargeable.  The Parties agreed that they would rely upon the evidence introduced at the Alter Ego Trial as the basis for the non-dischargeability decision.  The Parties filed post-trial briefs regarding the issue of dischargeability and subsequently confirmed that the Plaintiffs' claims under § 523(a)(2)(A) and § 727(a) were submitted for decision by this Court.  Pls.' Letter to Ct., Feb. 25, 2013, ECF No. 93.

In the interest of judicial economy and expediency, the Court has determined that it will also decide the issue of whether, in light of the Piercing Ruling, the Plaintiffs' state court monetary judgment against the Corporations, described below, should be declared void *ab initio* as entered in violation of the automatic stay.  *See* Discussion, section II.A.  The Parties have fully briefed this legal issue, and its resolution therefore requires no additional evidence or testimony.

## II.    Proceedings in New York Supreme Court

On April 16, 2004, the Plaintiffs here filed an amended complaint against "Stewart Adler

a/k/a Stuart Adler" and the Corporations in the New York Supreme Court for the County of New

York.  Pls.' Ex. 1, at 1, 19.  As to all defendants, this complaint sought damages based on ten

causes of action.  Pls.' Ex. 1, at 7–9, 11, 13–16.  The seventh cause (to pierce the Corporations'

veils) was pleaded against the Debtor personally.  Pls.' Ex. 1, at 12–13.  In the midst of this state

court proceeding, the Debtor filed the instant bankruptcy petition.  In light of the bankruptcy

filing, the New York Supreme Court severed the Plaintiffs' seventh and eighth causes—those

asserted against the Debtor individually—and proceeded to adjudicate the remaining causes of

action against the Corporations.  The state court ultimately concluded that, pursuant to the New

York Uniform Commercial Code ("N.Y. U.C.C."), the Plaintiffs were entitled to recover

$1,161,706.94, with interest from January 1, 2000, from the Corporations.  Pls.' Ex. 3, at 1, 5–7.

The State Court Decision was signed on August 4 and issued on August 20, 2005.  Pls.' Ex. 3, at

8.  On September 14, 2005, after adding legal expenses, lost income, and other costs and

disbursements to this original award and accounting for interest, the state court entered a

judgment against the Corporations in the amount of $2,024,345.57.  Pls.' Ex. 4, at 3.

## JURISDICTION AND AUTHORITY TO ENTER FINAL JUDGMENT

This Court has jurisdiction of this core proceeding under 28 U.S.C. §§ 157(b)(2)(J) and

1334(a) and (b) and in accordance with the Standing Order of Reference of the Eastern District

of New York dated August 28, 1986, and reconfirmed on December 5, 2012.

## DISCUSSION

### I.    Objections to, and Exceptions from, Discharge

In Chapter 7 cases, §§ 727 and 523, respectively, govern an individual debtor's discharge

*in toto* and the dischargeability of individual debts.  If one of the ten objections to discharge

enumerated in § 727(a) is proven, none of the Debtor's obligations will be discharged by the bankruptcy filing.  11 U.S.C. § 727(a), (b); *Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 395 (Bankr. E.D.N.Y. 2005).  If a debtor's discharge is denied in its entirety, all reasons to except a particular obligation from discharge under § 523(a), are rendered moot.  *See, e.g.*, *Chittenden Trust Co. v. Mayo (In re Mayo)*, 94 B.R. 315, 318–19 (Bankr. D. Vt. 1988); *Peoples State Bank of Mazeppa, MN v. Drenckhahn (In re Drenckhahn)*, 77 B.R. 697, 701 (Bankr. D. Minn. 1987).  As the Instant Decision details, this Court finds the Plaintiffs to have met their burden of proving their § 727(a) claims.  Thus, it is unnecessary to decide the merits of the Plaintiffs' § 523(a)(2)(A) claim.

## II.    Rights (§ 362(a)) and Obligations (§ 727(a)) of an Alter Ego

In accordance with New York law, in piercing the Corporations' veils, this Court concluded that (1) the Debtor dominated the Corporations and (2) used this control to commit a wrong that (3) led to the Plaintiffs' unjust loss.  *In re Adler*, 467 B.R. at 292, 296–97; *Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 138 (2d Cir. 1991) ("*Passalacqua*"); *Morris v. State Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1161 (N.Y. 1993) (describing *Passalacqua* as an application New York law).  Its distinctness obscured, this first element is in fact a restatement of a common law concept—the alter ego doctrine—that often forms only one basis for disregarding the corporate fiction.  *See, e.g.*, *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 42 (1st Cir. 2012) (internal quotation marks omitted) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)); *Int'l. Union, UAW v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005); *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (Texas).  However, because of these equitable remedies' merger into one rule of corporate disregard in New York, if a party can prove no more than a corporation's "complete domination, not only of

finances, but of policy and business practice in respect to the transaction attacked" and hence its status as an alter ego, New York courts cannot abrogate limited liability. *See MAG Portfolio Consult, GmbH v. Merlin Biomed Grp.*, 268 F.3d 58, 63 (2d Cir. 2001).

Still, the effects of the two doctrines on any person, including a debtor under the Code, are logically and legally distinguishable. In New York, veil-piercing will always require proof of a wrong or fraud as well as an injury. In and of itself, an alter ego finding confirms not the commission of a wrong or the occurrence of an injury; instead, it formally recognizes what was a preexisting fact: at the time of the relevant transaction, one or more controlling principals and one or more corporations were in actuality one and the same person, the former inseparable from the latter and its liability both personal and direct. Separately from the veil piercing doctrine, of which it is an inextricable part under New York law, it is this import of any court's alter ego determination, including this Court's Piercing Ruling, that affects the rights and obligations of any individual debtor under §§ 362(a)(1) and 727(a).

## A.    *Alter Ego and § 362(a)*

Section 362(a)(1) stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The filing of a voluntary petition triggers this self-executing injunction that is binding until modified by the bankruptcy court or expiring by its own terms. *Id.*; 11 U.S.C. § 362(c); *Mobuka N.Y. LLC v. Pitts (In re Pitts)*, No. 808-74860-reg, 2009 Bankr. LEXIS 4023, at *9 (Bankr. E.D.N.Y. Dec. 8, 2009). Section 362(a) applies to all entities, including state courts, and, subject to § 362(b) and (c), is effective regardless of a party's actual knowledge of the stay's applicability to its action. 11 U.S.C. § 362(a)–(c); *In re Pitts*, 2009 Bankr. LEXIS 4023, at *9.

Because it refers purely to actions against "the debtor," § 362(a)(1) stays are generally "limited to debtors and do not encompass non-bankrupt co-defendants." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) (collecting cases). Notwithstanding this rule, if certain unusual circumstances arise during the pendency of a debtor's bankruptcy case, a bankruptcy court may enjoin actions against third-parties. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) ("*Robins*"), *cert. denied*, 479 U.S. 876 (1986); *Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825–26 (5th Cir. 2003) (discussing *id.* and related cases). Elaborating upon one example of unusual circumstances discussed in *Robins*, the Second Circuit has found that the automatic stay applies to third parties "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) ("*Queenie*") (citing *Robins*, 788 F.2d at 999). This "adverse economic consequence" requirement, as articulated in *Queenie* or as derived from *Robins*, has been construed to include any perceptible economic harm to a non-party debtor's tangible or intangible property interest. *E.g.*, *Stephen Inv. Secs. v. SEC*, 27 F.3d 339, 342 n.5 (8th Cir. 1994); *N. Star Contracting v. McSpedon (In re N. Star Contracting Corp.)*, 125 B.R. 368, 370 (Bankr. S.D.N.Y. 1991). Since *Robins* and *Queenie*, courts have found the requisite economic harm to an individual debtor when the veil of a non-debtor corporation is pierced based on the alter ego doctrine, as the individual debtor has thereby been rendered personally liable for the relevant corporate debts. *E.g.*, *S.I. Acquisition, Inc. v. Eastway Delivery Serv. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1147 (5th Cir. 1987); *In re Kuecker Equip. Co.*, 338 B.R. 52, 60–61 (Bankr. W.D. Mo. 2006). Critically, when a corporate veil is so pierced, the controlling debtor's liability attaches not as of the issue date of any formal piercing judgment; rather, it had attached at the moment in time in which the factual

elements of the piercing remedy, as dictated by governing law, had materialized.  Consequently, so long as the facts necessary to establish a debtor's liability pursuant to New York's piercing doctrine arose prepetition, *Queenie*'s "immediate adverse economic consequences" test had been triggered prepetition, and the automatic stay protected any non-debtor alter ego corporation from further judicial action, just as surely as it shielded the individual debtor, even though its status as an alter ego had not yet been ascertained.  *See Kline v. Deutsche Bank Nat'l Trust Co. (In re Kline)*, 472 B.R. 98, 103 (B.A.P. 10th Cir. 2012).  Thus, if two judicial determinations have been made—(1) one or more non-debtor corporations has been found liable for a prepetition debt on a cause of action asserted in a post-petition proceeding, and (2) the veil between these corporate alter egos and the non-party debtor has been pierced— the § 362(a)(1) stay was violated by the post-petition proceeding.  This conclusion is true regardless of any knowledge by the issuing court or plaintiff and in spite of a debtor's formal severance from the proceeding.  *See, e.g.*, *Secs. Investor Prot. Corp. v. Bernard Madoff Inv. Secs.*, 460 B.R. 106, 122 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Tucker v. Am. Int'l Grp.*, 745 F. Supp. 2d 53, 63–64, 64 n.15 (D. Conn. 2010); *In re Pitts*, 2009 Bankr. LEXIS 4023, at *23–24.

These are precisely the facts before this Court.  Here, the New York Supreme Court issued a post-petition judgment finding the Corporations liable to the Plaintiffs for $2,025,849.97, and this Court later found the Debtor liable for the debts of his alter ego Corporations in its Piercing Ruling.  As soon as the Court pierced the Corporations' veils pursuant to New York law, the State Court Decision against the Corporations became a judgment against the Debtor, effective as of the date of judgment: September 14, 2005.  In this case, since the Corporations were "created" as a "network of entities that were never intended to be independent profit centers," they lacked any individuality distinct from that of their controlling

principal, the Debtor himself, from their very beginnings. *In re Adler*, 467 B.R. at 292. Under New York law, the corporate existence begins upon or within ninety days of the filing of a certificate of incorporation, N.Y. BUS. CORP. LAW § 403, and because the last of the five Corporations was incorporated prepetition, the Debtor and every alter ego Corporation cannot be regarded as anything but a single true entity in the years preceding the Petition date, *see Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988) (stating that, under Virginia law, "the corporation and the alter ego are one and the same" (internal quotation marks omitted)); *In re S.I. Acquisition, Inc.*, 817 F.2d at 1152 (stating that "[t]he remedy of alter ego under Texas law appears to be available . . . so long as the requisite melding of the corporation and tis control entity are established" and that "[t]he doctrine of alter ego does not rest upon a particular creditor's dealings with or reliance on the control entity" or "require a showing of fraud on a particular creditor"). Due to his prepetition position as his Corporations' alter ego, for each prepetition obligation that these dummies incurred, the Debtor was always individually liable, whether directly or indirectly. When the New York Supreme Court found the Debtor's alter ego Corporations liable on August 5, 2004, Pls.' Ex. 3, at 6, and entered judgment on September 14, 2005, it thus issued a post-petition judgment that made the Debtor liable for a prepetition claim. For that reason, pursuant to the *Robins* and *Queenie* line of cases, the State Court Decision against the Debtor's alter ego Corporations violated § 362(a)(1). *See, e.g.*, *In re Winer*, 158 B.R. 736, 743 (N.D. Ill. 1993); *In re Metal Ctr., Inc.*, 31 B.R. 458, 462–63 (Bankr. D. Conn. 1983); *Funding Sys. Railcars, Inc. v. Pullman Std., Inc.*, 34 B.R. 706, 709 (N.D. Ill. 1983). As a violation of the automatic stay, the State Court Decision is *void ab initio*. *Rexnord Holdings v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994). Pursuant to Fed. R. Civ. P. 60(b)(4), made applicable to this proceeding by Fed. R. Bankr. P. 9024, this Court is bound *sua sponte* to

declare the State Court Decision and judgment *void ab initio*.[5]  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 138 (2d Cir. 2011); *Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 111 (2d Cir. 2001).

### 1.    Response to Plaintiffs' Arguments as to *Queenie*

While the Plaintiffs question *Queenie*'s applicability to this case, this Court is unconvinced by this argument.  Pls.' Reply 1–3, Docket No. 56; Pls.' Post-Tr. Br. 27, n.7, Docket No. 75.  Admittedly, the *Queenie* court limited the stay's application as to "non-debtors" to those cases "when a claim . . .  will have an immediate adverse economic consequence for the debtor's estate."  *Queenie*, 321 F.3d at 287.  Based on this language, as the Plaintiff notes, some courts have limited *Queenie*'s reach to cases involving a chapter 11 debtor whose reorganization would conceivably be hampered by suits against "non-debtor" entities.  *See, e.g.*, *Uto v. Job Site Servs.*, 444 B.R. 222, 224 (E.D.N.Y. 2011); *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07-CV-9931 (WHP), 2012 U.S. Dist. LEXIS 87718, at *3–4 (S.D.N.Y. June 25, 2012).  This Court's alter ego determination, however, has shown that each Corporation was but an indivisible extension of the Debtor before the state court action had begun.  Consequently, no legally meaningful distinction between the apparently "non-debtor" Corporations and the Debtor existed when, post-petition, the Plaintiffs severed the Debtor and to continue with their state court suit against only the Corporations.  Pls. Ex. 3, at 1.  When the Plaintiffs proceeded against the Corporations collectively in the New York Supreme Court, they advanced not against a "non-debtor," as in *Queenie* and *Robins*, but against *the* Debtor, the sole party in interest in that suit.

---

[5]    Because the State Court Decision and judgment are void, all of the legal and factual findings therein are without legal effect.  This fact does not conclusively decide the Debtor's objection to the Plaintiffs' claim, currently pending before this Court.  Debtor's Mot. to Obj. to Claim, Mar. 30, 2009, Docket. No. 36, ECF No. 04-84807.  It also does not preclude the Plaintiffs from pursuing available remedies against the Debtor in state court.

Since § 362(a)(1) plainly prohibits the "continuation of . . . a judicial . . . action or proceeding against the debtor," the Debtor's status as an alter ego rendered the state court suit a violation of this Code section.  11 U.S.C. § 362(a)(1); *In re Pitts*, 2009 Bankr. LEXIS 4023, at *9–10.  Were it not for § 362(a)(1), the State Court Decision's findings as to damages would be fully binding against the Debtor under the doctrine of collateral estoppel.  However, because of the Debtor's status as an alter ego who was directly and personally liable for the Corporations' obligations, the State Court Decision must be declared void, a result that the district court on appeal of this Court's granting of the Plaintiffs' first motion for summary judgment had foreseen.  *Adler v. Ng (In re Adler)*, 395 B.R. 827, 840 (E.D.N.Y. 2008) ("[I]f the factual findings made in the state proceeding with respect to the corporation were binding against the Debtor under the doctrine of collateral estoppel, such a result would violate the automatic stay and be void as a matter of law.").

This interpretation is buttressed by portions of *Queenie* and related decisions. First, the court itself acknowledged that "immediate adverse economic consequences" would "normally" be the only reason for the stay to shield non-debtors.  *Queenie*, 321 F.3d at 287.  "[N]ormally" does not quite mean exclusively, and it would not be illogical to regard the adverse consequences test as one reason to read § 362(a)(1) broadly.  More importantly, when the Second Circuit listed examples of "immediate adverse economic consequences," it cited to *Robins* for the third: "an action where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant."  *Id.* (internal quotation marks omitted) (quoting *Robins*, 788 F.2d at 999).  As written and explained, this third illustration was neither limited to chapter 11 debtors nor did it require that a plan of reorganization be endangered.  So long as a debtor was "the real party defendant" during the relevant post-petition judicial

proceeding, the automatic stay had applied. *Id.*; *Robins*, 788 F.2d at 999.  In this case, as the

Corporations were never anything but the Debtor's alter egos, he was always the one real

defendant contemplated in *Robins* and *Queenie*, and the stay in § 362(a)(1) thus protected the

Debtor as of the Petition date—July 28, 2004—by barring the Plaintiffs' state court action

against the alter ego Corporations.  This Court also notes that the emphases in much, albeit not

all, subsequent case law has been on the language of and the purposes behind § 362(a), a

provision designed to protect more than chapter 11 debtors.  *E.g.*, *Reliant Energy Servs.*, 349

F.3d at 825–26; *Robins*, 788 F.2d at 999; *M.E.S., Inc. v. M.J. Favorito Elec., Inc.*, No. 1:09-CV-

5852-SEV-JMS, 2010 U.S. Dist. LEXIS 2380, at *7 n.3 (E.D.N.Y. Mar. 15, 2010); *In re*

*Cheyenne Sales Co.*, No. 09-741, 2009 Bankr. LEXIS 1118, at *4–5 (Bankr. N.D. W. Va. May

19, 2009).  A threat to a chapter 11 debtor's reorganization is certainly a persuasive reason why a

stay may shelter a non-debtor; even so, that particular justification is not substantively identical

to the third example in *Queenie* and the rule elaborated in *Robins* regarding real party

defendants.  *See, e.g.*, *Acker v. Wilger*, No. 12-CV-3620 (JMF), 2012 U.S. Dist. LEXIS 161628,

at *4–5 (S.D.N.Y. Oct. 25, 2012); *Zurich Am. Ins. Co. v. Trans Cal. Assocs.*, No. 2:10-01957

WBS KJN, 2011 U.S. Dist. LEXIS 145080, at *6–7 (E.D. Cal. Dec. 16, 2011).

Finally, the Plaintiffs cannot claim to have been unaware of the Debtor's potential status

as an alter ego, whether on or after the Debtor's filing.  In fact, the seventh cause of action in

their state court complaint was to pierce the Corporations' veils and render the Debtor liable.

Pls. Ex. 1, at 12–13.  Under this count, not only did the Plaintiffs allege the predicates for an alter

ego finding, as required to pierce under New York law, but they explicitly alleged that the

Debtor was the Corporations' alter ego.  *Id.* ¶¶ 75–76, 79, 80.  In their complaint, the Plaintiffs

had affirmed their belief that the Debtor was an alter ego and, as such, was *Robins*' "the real

party defendant." *Robins*, 788 F.2d at 999.  That the Plaintiffs did not anticipate the consequences of this Court finding one of their original allegations to be true does not make that result an unfair surprise, for it was neither unforeseeable nor inconsistent with existing law.

**B.      *Alter Ego and § 727(a)***

Whether or not it is part of a state's veil-piercing doctrine, the consequence of an alter ego determination is not simply the imposition of personal liability on a principal for the obligations of a dominated corporation.  Rather, since an alter ego corporation both lacked an existence separate from the person who controlled it and functioned as less than a bona fide independent entity during the relevant time period, the acts of that corporation are actually the acts of the controlling individual.  *See Elec. Switching Indus., Inc. v. Faradyne Elecs. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987); *Doctor's Assocs. v. Distajo*, 66 F.3d 438, 453–54 (2d Cir. 1995) (quoting *Fisser v. Int'l Bank*, 282 F.2d 231, 234 (2d Cir. 1960)), *aff'd*, 89 F.3d 109 (2d Cir. 1996), *cert. denied*, 517 U.S. 1120 (1996).  The principal might have initially adhered to state law requirements for creating a legally valid corporation, but an alter ego finding nonetheless compels a court to regard that corporation as devoid of genuine independence and to attribute responsibility for this alter ego's actions to the one true "person," whether a natural or artificial entity, who directed its affairs.  *See Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674–75 & 675 n.14 (5th Cir. 2006); *Wallace v. Wood*, 752 A.D.2d 1175, 1184 (Del. Ch. 1999). As to the Corporations with which the Plaintiffs dealt, the Debtor was such a principal.

Accordingly, pursuant to the Court's Piercing Ruling, the actions and assets of each Corporation were always, as a matter of fact and law, the actions and assets of the Debtor as an individual.  Therefore, this Court finds that the Debtor, in his individual bankruptcy petition, must have accounted for any endeavor by, and any property of, the Corporations in order to

avoid denial of his discharge pursuant to § 727(a). Having chosen not to maintain any real distinction between himself and the Corporations in the running of each alter ego prepetition, the Debtor must not have concealed the Corporations' property (§ 727(a)(2)(A)), left their records unpreserved (§ 727(a)(3)), failed to provide an adequate explain for their assets' loss or deficiency (§ 727(a)(5)), or sworn a false oath as to their material business transactions (§ 727(a)(4)(A)) post-petition. As Section III of this Discussion details, the Debtor did not do so, contravening § 727(a) for these failures in addition to a series of omissions and misstatements regarding what was his individual property.

### III.    Denial of Discharge: § 727(a)

Four different objections enumerated in § 727(a) are before the Court: (2)(A), (3), (4)(A), and (5). Denial of discharge is warranted whenever any of § 727(a)'s subsections is proved. 11 U.S.C. § 727(a), (b); *Martin v. Key Bank, N.A. (In re Martin)*, 208 B.R. 799, 805 (N.D.N.Y. 1997). As § 727(a) imposes "an extreme penalty for wrongdoing," it "must be strictly construed against those who object to the debtor's discharge and liberally in favor of the bankrupt." *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotation marks omitted) (citing *Bank of Pennsylvania v. Adlman (In re Adlman)*, 541 F.2d 999, 1003 (2d Cir. 1976)). When a plaintiff objects to a debtor's discharge, the standard of proof is preponderance of the evidence, and the burden of persuasion always lies with the plaintiff. Fed. R. Bankr. P. 4005; *Republic Credit Corp. I. v. Boyer (In re Boyer)*, 328 Fed. Appx. 711, 714 (2d Cir. 2009). The facts sustaining an objection "must be real and substantial." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (internal quotation marks omitted) (citing *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934)). Applying these standards to the Parties' evidence, this Court finds that the Plaintiffs have met their burdens as to the objections raised in §

727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

**A.      *Illicit Concealment of Debtor's Property: § 727(a)(2)(A)***

Section 727(a)(2)(A) reads: "The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of filing of the petition." 11 U.S.C. § 727(a)(2)(A).  To meet the burden encoded in this subparagraph, a plaintiff must prove four elements: (1) the property "transferred, removed, destroyed, mutilated, or concealed" was "property of the debtor," and (2) the debtor committed one of these five "improper act[s]" within (3) one year of filing and (4) with "a subjective intent to hinder, delay, or defraud a creditor." *In re Boyer*, 328 Fed. Appx. at 714 (internal quotation marks omitted); *accord Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993).

**1.      "[P]roperty of the debtor": § 727(a)(2)(A)**

As to this Debtor, for purposes of § 727(a)(2)(A), "property of the debtor" exists in three forms.  The first two property interests would be the Debtor's individual assets independent of this Court's alter ego finding.  Under § 541(a)(1), "property of the estate" includes all "legal or equitable interests of the debtor as of the commencement of the case"; such property includes the Debtor's prepetition earnings from services that he performed on behalf of the Corporations.  *See* 11 U.S.C. §§ 541(a)(1), (a)(6).  In addition, the term of art "property of the debtor" in 727(a)(2)(A) must be read as including the Debtor's tangible and intangible "assets" as defined by New York law.  *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (first noting that "property" and "interests in property" are "creatures of state law" under the Code and then applying article 3 of the U.C.C. as codified in New Mexico); *Kaufman v. Chalk & Vermillion Fine Arts, LLC*, 31

Fed. Appx. 206, 208 (2d Cir 2002) ("Because the Bankruptcy Code does not define interests in property, state law controls." (internal quotation marks omitted)).  Among other things, an asset is any form of personal property with value, including money and written instruments that "create[]," "acknowledge[]," or "evidence[]" a financial obligation, not exempt from liability by statute or common law.  N.Y. GEN. CONSTR. LAW §§ 38–39; N.Y. DEBT. & CRED. LAW § 270. As the breadth of these definitions suggests, the property's particular form and location on the Petition date is irrelevant to whether it constitutes "property of the debtor."  So long as an asset that the Debtor once possessed and controlled had value, it constitutes his property.  It thus has no significance that the Debtor chose to deposit some of his income in a financial account that listed only his wife, Ms. Cindy Speiser ("Ms. Speiser"), as an owner.  Tr. 9/20/10 at 81:13–15; Tr. 9/21/10 at 95:20–21, 97:10–12.  It is equally inapposite to whether this income was actually his property that the Debtor stored his income—and some fraction of the Corporations' revenue—in yet another account maintained by the last corporation, Stewart Sourcing & Manufacturing Company, Inc. ("Stewart Sourcing"), that he founded prepetition.  Tr. 2/3/11 at 22–23, 142:9–11, 143, 4–7.  Simply put, the funds deposited in these accounts represented the Debtor's earnings and were all his "property," as defined in § 541(a)(1), for purposes of § 727(a)(2)(A).

In contrast to this property, the third interest in property relevant to this proceeding is the proceeds that the Corporations gained from the sale of their accounts receivables.  According to testimony by the Debtor and Mr. Portnoy, the Corporations obtained more than $3 million through the sales of accounts receivable.  Tr. 9/20/10 at 50: 10–13, 21–23; Tr. 9/22/10 at 36:19–25.  These proceeds are simultaneously property of the Debtor and the Corporations as a direct consequence of this Court's Piercing Ruling, as this Court's alter ego finding established that the

Corporations, by virtue of being the Debtor's alter egos, did not and could not own any property separately from the Debtor. Consequently, like the Debtor's prepetition earnings and his few tangible assets, the proceeds accumulated by the Corporations through factor financing are "property of the debtor" for purposes of § 727(a)(2)(A).

### 2. "[C]oncealed . . . within one year": § 727(a)(2)(A)

The next two elements of the test for the objection to discharge in § 727(a)(2)(A) are often interlinked: a debtor's commission of one of five impermissible acts ("transferred," "removed," "destroyed," "mutilated," or "concealed") within "one year before the date of filing of the petition." 11 U.S.C. § 727(a)(2)(A); *Painewebber, Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 440 n.6 (S.D.N.Y. 1996). From the case law, this Court discerns two distinct definitions of "concealed": (1) when a debtor has transferred title to an asset yet retained some "beneficial interest," *CadleRock Joint Venture II, L.P. v. Beaudoin (In re Beaudoin)*, 388 B.R. 6, 8 (D. Conn. 2008), or (2) when no transfer of property having occurred, a debtor withholds "knowledge of an asset by the failure or refusal to divulge information required by law to be made known," *Buckeye Ret. Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 654–55 & 654 n.6 (B.A.P. 6th Cir. 2008) (collecting cases). A debtor thus "conceal[s]" what is "property of the debtor" under § 727(a)(2)(A) when he attempts to prevent its discovery by either placing assets beyond the reach of his or her creditors or proffering false or misleading answers regarding such property. *Marine Midland Bank v. Portnoy (In re Portnoy)*, 201 B.R. 685, 695 (Bankr. S.D.N.Y. 1996) (quoting 4 COLLIER ON BANKRUPTCY ¶ 727.02[6][b] (15th ed. 1994)); *see also Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (citing *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984) ("[I]t is enough that one withholds knowledge, or prevents disclosure or recognition." (internal quotation marks omitted))).

Applying this standard, the Court finds that the Debtor concealed "property of the debtor" within one year before the date of the filing of the bankruptcy petition.  At the statutorily mandated meeting of the creditors, the Debtor testified that his companies "never made payments to his family members."  Tr. 9/20/10 at 141:20–21.  Before this Court, however, the Debtor acknowledged that he, on behalf of the Corporations, wrote several checks to Ms. Speiser, Tr. 9/20/10 at 144:7–14; Tr. 11/17/10 at 57:4–8, 58:5–6, 14–16, thereby transferring the property of the Corporations into his wife's account and concealing its origin as the proceeds of the Corporations.  In addition, as some of these funds represented the Debtor's salary, the Debtor repeatedly transferred his personal earnings, standard property under the Code, to Ms. Speiser; the absence of his name on her account could only obscure that the property diverted was the Debtor's personal income.  Debtor, however, never relinquished his hold on these funds, as, from her account, Ms. Speiser paid some of the Corporations' bills and business expenses as well as the Debtor's personal debts up until his filing, Tr. 9/20/10 at 79:13–22; Tr. 9/21/10 at 97:10–12, and pursuant to his explicit directions, Tr. 9/20/10 at 80:16–19.  Through filing, the Debtor had deposited assets, whether in the form of his own personal income or as revenues of the Corporations, into an account that bore his wife's name alone, Tr. 9/20/10 at 81:13–15, yet the Debtor did not disclose its existence in Schedule B of the Petition.  Whatever his reasons, he thereby omitted mention of an account in which "property of the debtor" had been deposited and over whose dispersal he fully controlled.  While the Debtor would claim that he had no assets in his name, Tr. 9/21/10 at 154:15–17, these manifold property interests were legally his property as an individual, property over which he wielded considerable, if not absolute, control.  By not openly divulging that he had transferred personal and Corporate funds to others' names yet had retained direction over their use prior to any litigation, the Debtor attempted to prevent discovery

of his property and interests in property within one year of the Petition's filing. *In re Swegan*, 383 B.R. at 654; *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 & n.4 (5th Cir. 1987) ("Concealing property . . . can be accomplished by a transfer of title coupled with the retention of the benefits of ownership.").

In addition to concealment of assets, courts have held that withholding of financial information critical to ascertaining the extent of a debtor's estate constitutes "conceal[ment]," actionable under § 727(a)(2)(A) when, as here, it is left concealed within one year of filing. *E.g.*, *In re Scott*, 172 F.3d at 967 (internal quotation marks omitted) (quoting *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984)); *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 918, 918 n.47 (Bankr. D. Utah 2006) (citing *In re Scott*, 172 F.3d at 967). As the Debtor's testimony confirmed, he kept fourteen boxes of corporate records in his garage for years prior to the Petition's filing. Tr. 11/16/10 at 148:15–17. According to Mr. Portnoy, "the sales invoices," "invoices from his suppliers," and "bills" in these boxes accurately reflected the complete disposition of his Corporations' $2.2 million in assets; these records would form the basis of "an analysis of sales matching up associated cost of goods sold . . . to see . . . whether they were profitable or unprofitable" that the Debtor would cite for support of his explanation under § 727(a)(5) and to rebut the inference or fraudulent intent under § 727(a)(4)(A). Tr. 9/22/10 at 160:17–18, 13–15; Tr. 11/16/10 at 148:15–17. According to the Debtor himself, these records contained details of the assets held in his and the Corporations' names, detailing the financial dealings and transactions in which he and the Corporations, as his alter egos, fully participated. Yet, in response to the Court's question, "[W]ere these documents turned over?" the Debtor's counsel conceded, "I don't believe they were," Tr. 9/22/10 at 160:9–20. In September 2010, the Debtor insisted that these documents had been turned over, Tr. 9/21/10 at 99:2–3, and in

November 2010, he at first made the same claim, "I've issued most of this stuff I believe to you guys a long time ago," Tr. 11/16/10 at 148:4–5.  On that same day, however, the Debtor not only admitted to having had all fourteen boxes in his possession years before filing but also acknowledged that the thousands of documents had not, in fact, been previously proffered, Tr. 11/16/10 at 148:8, even as he gave two contradictory excuses, claiming ignorance of their presence in his garage, Tr. 11/16/10 at 148:17, and that Fresh New Clothing, one of the five Corporations expressly identified in the Plaintiffs' complaints in the New York Supreme Court as well as this Court, was "not part of this situation," Tr. 11/16/10 at 150:1; Pls.' Ex. 3.  Thus, while the Debtor's own accountant would describe these records as essential to tracing the Debtor's use of his alter ego Corporations' property, the Debtor did not turn over records that remain, as of February 2011, the only still existent records of the Corporations' business activities.  He did eventually surrender the boxes themselves, but as neither he nor Mr. Portnoy identified a single supporting document amidst a disorganized panoply of boxes, Tr. 11/16/10 at 82:6–10, the property's location and disposition remains impermissibly unknown.  Pursuant to prevailing case law, the Debtor attempted to prevent discovery of his losses and profits as an individual before and after filing, and these acts by themselves provide the basis for finding concealment of property under § 727(a)(2)(A).

### 3.    "[I]ntent to hinder, delay, or defraud": § 727(a)(2)(A)

The final element—a debtor's actual, rather than constructive, intent—focuses on a debtor's wrongful conduct towards a creditor, regardless of actual effect on one, some, or all.  11 U.S.C. § 727(a)(2)(A); *Cadle Co. v. Marra (In re Marra)*, 308 B.R. 628, 630 (D. Conn. 2004); *Locke v. Schafer (In re Schafer)*, 294 B.R. 126, 131 (N.D. Cal. 2003) (relying in part on *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.3d 1279, 1282 (9th Cir. 1996)).  Courts will find the

requisite intent "to hinder, delay, or defraud" a creditor from either: (1) direct or explicit proof, a rarity, or (2) a preponderance of circumstantial evidence of a debtor's illicit intent, the so-called "badges of fraud" (the "badges").  *In re Boyer*, 328 Fed. Appx. at 715 & n.2 (internal quotation marks omitted) (citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983)); *see also Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003) (describing the six badges that appear in *In re Kaiser*, 22 F.2d at 1582–83, as those "that tend to prove actual intent to defraud").  Within the context of § 727(a)(2)(A), the customary badges number six: "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry"; (7) "[t]he transfer of property of a debtor to his spouse while insolvent, while retaining the use and enjoyment of the property"; and (8) "[t]he shifting of assets by the debtor to a corporation wholly controlled by him."  *In re Kaiser*, 722 F.2d at 1582–83 (internal citations omitted).  Since *Kaiser*, the courts have identified two other scenarios that tend to show a fraudulent intent in analyzing § 727(a)(2)(A): (9) "an[y] attempt by the debtor to keep the transfer a secret," *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 660 (B.A.P. 1st Cir. 2011); *Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002), and (10) a so-called "diversion of asset theory" that is applicable "where a debtor attempts to frustrate creditors by diverting the fruits of his industry to others, who then provide him with the use and enjoyment of those fruits," *In re Boyer*, 328 Fed. Appx. at 715 (citing *Cadle Co. v. Ogalin (In re Ogalin)*, 303

B.R. 552, 558–59 (Bankr. D. Conn. 2004)).

Here, within one year prior to filing, this Court finds that the Debtor offered false or misleading answers and data regarding his property with the objective of "attempting to prevent . . . [its] discovery," thereby effecting the concealment of "the property of the debtor" with the "intent to hinder, delay, or defraud" that is prohibited by § 727(a)(2)(A). *In re Swegan*, 383 B.R. at 654–55. Through filing, the Debtor repeatedly deposited his income into an account held only in the name of Ms. Speiser, Tr. 9/20/10 at 80:16–19, or under the title of Stewart Sourcing. For years, all of the Debtor's earnings and all of the Corporations funds, both these interests "property of the debtor," were deposited into an account bearing neither the Debtor's nor the Corporations' names, and the Debtor could not recall whether he had maintained a single bank accounts in his own name between June or July 1994 and July 2004 . Tr. 9/20/10 at 77:15–18. Though purportedly lacking one financial account, the Debtor nonetheless controlled the funds dispersed by Ms. Speiser, Tr. 9/20/10 at 80:16–22, or from Stewart Sourcing's corporate account. By his own admission, then, the Debtor transferred his property to either his spouse or yet another corporation that he controlled even as he retained the use and enjoyment of the property, "diverting the fruits of his industry to his family members." *In re Ogalin*, 303 B.R. at 558. Within a year of his filing, Ms. Speiser and Stewart Sourcing acted at the Debtor's direction, paying off his utilities and sundry personal expenses, Tr. 9/22/10 at 143:22–23, 144:1–2; Tr. 11/17/10 at 55:16–20, and thereby "provide[d] him with the use and enjoyment of those fruits." *In re Boyer*, 328 Fed. Appx. at 715. Such transferal of property to a spouse without any discernible loss of control or to another corporation whose operations he fully dictated, here Stewart Sourcing, constitutes one or more of several badges of fraud highly indicative of fraudulent concealment. *In re Kaiser*, 722 F.2d at 1582–83; *Murphey v. Crater (In re Crater)*,

286 B.R. 756, 764–65 (Bankr. D. Ariz. 2002) (adducing eleven badges but noting that three— retention of possession or control, concealment of a transfer, and removal of assets from a debtor's name—that independently indicate "concealment, deception, or fraudulent intent"). Revealingly, the Debtor himself admitted that he utilized Ms. Speiser's account with the explicit goal of preventing the Internal Revenue Service from claiming these funds. Tr. 9/20/10 at 139:14–18.  Prevention of his property's discovery was thus his goal and aim in directing his earnings and his alter egos' proceeds to his wife's bank.  When a debtor is so motivated, courts have not hesitated to find deliberate concealment, yet another badge that can alone establish a debtor's fraudulent intent.  *See, e.g.*, *In re Crater*, 286 B.R. at 766; *Martin Marietta Materials Sw., Inc. v. Lee (In re Robert E. Lee & Shirley G. Lee)*, 309 B.R. 468, 482–83 (Bankr. W.D. Tex. 2004) (discussing *id.*).  *Cf. In re Glunk*, 342 B.R. 717, 733–35 (Bankr. E.D. Pa. 2006) (praising *In re Crater*'s categorization of eleven badges but discussing § 707(a)).  This one admission, when considered along with the evidence of fraudulent intent afforded by the other aforementioned badges, establishes that the very purpose of the Debtor's repeated transfers of funds from the Corporations' coffers to others' financial accounts was one that § 727(a)(2)(A) was intended to punish: evading disclosure of his assets and possible attachment by his creditors.

### 4.    Conclusion: § 727(a)(2)(A)

The Plaintiffs have proven by a preponderance of the evidence that the Debtor fraudulently concealed his property within one year prior to filing.  Accordingly, the Debtor's discharge will be denied pursuant to § 727(a)(2)(A).

**B.**      ***Failure to Justify Inadequate Records: § 727(a)(3)***

Section 727(a)(3) prohibits a debtor's discharge if that "debtor has concealed, destroyed,

mutilated, falsified, or failed to keep or preserve any recorded information . . . from which the

debtor's financial condition or business transactions might be ascertained, unless such act or

failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).

Lacking an intent requirement, § 727(a)(3) establishes a two-step, burden-shifting approach that

makes adequate record-keeping a predicate for a debtor's discharge.  *D.A.N. Joint Venture v.*

*Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006) (relying on a pre-Code case, *White v.*

*Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941)); *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309

B.R. 429, 436 (S.D.N.Y. 2004).

**1.**      **Inadequate Records: Plaintiffs' Burden under § 727(a)(3)**

At first, a plaintiff must prove "that the debtor failed to keep and preserve any books or

records from which the debtor's financial condition or business transactions might be

ascertained."  *In re Cacioli*, 463 F.3d at 235.  A record's "adequacy" is measured by utilizing

eight non-exhaustive factors: (1) whether the debtor was engaged in business, and if so, the

complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether

the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the

debtor's education, business experience, and sophistication; (5) the customary business practices

for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the

debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part;

and (8) the debtor's courtroom demeanor.  *State Bank of India v. Sethi (In re Sethi)*, 250 B.R.

831, 838 (Bankr. E.D.N.Y. 2000) ("*Sethi*"); *see also In re Cacioli*, 463 F.3d at 236 n.9

(clarifying that the *Sethi* test is to be used for determining the adequacy of a debtor's records and

not for judging the credibility of his or her justification).  Pursuant to this case law, for a creditor

to meet his initial burden of proving that a debtor has not supplied the substantially complete and

accurate records required by § 727(a)(3), a creditor may show either (1) the provided records'

inadequacy in accordance with *Sethi*, or (2) the impossibility of ascertaining "the debtor's

present financial condition and the nature of any business transaction that occurred within a

reasonable period prior to filing" from these tendered records.  *In re Sethi*, 250 B.R. at 837–38;

*Schackner v. Breslin Realty Dev. Corp.*, No. 11-CV-2734 (JS), 2012 U.S. Dist. LEXIS 1001, at

*12–13 (E.D.N.Y. Jan. 5, 2012).

Turning first to the burden-shifting analysis utilized by this circuit, the Court finds that

the Plaintiffs have established a *prima facie* case for the insufficiency of the Debtor's record-

keeping.  The records kept by ordinary people, including lawyers, physicians, and even

businesspersons, do not need to be "so complete that . . . [they] can satisfy an expert in

business," *Pu v. Mitsopoulos (In re Mitsopoulos)*, 487 B.R. 604, 612 (Bankr. E.D.N.Y. 2013)

(quoting *In re Sethi*, 250 B.R. at 838), or constitute "an impeccable system of bookkeeping,"

*Hughes v. Wells (In re Wells)*, 426 B.R. 579, 594 (Bankr. N.D. Tex. 2006).  Nevertheless, a

debtor with alleged "business sophistication and acumen" has a "greater responsibility to

maintain accurate records than the unsophisticated debtor."  *Nisselson v. Wolfson (In re

Wolfson)*, 152 B.R. 830, 834 (S.D.N.Y. 1993).  A debtor's "education, business experience, and

sophistication" is a significant factor bearing on the adequacy of a debtor's records.  *In re Sethi*,

250 B.R. at 838.  The Debtor here described himself as having business experience and

sophistication. Tr. 9/20/10 at 33:13, 34:2, 7, 36:10–11.  Per his own testimony, however, the

Debtor did not provide records sufficient to ascertain how the assets of at least two of the five

Corporations (J.U.N.K. and Seruchi) were distributed, or the whereabouts of a sum of between

$80,000 and $90,000 that one or more Corporations earned in 1997–2000.  Tr. 2/3/11 at 123:21–24; Tr. 9/21/10 at 98:8–10.  The Debtor's records did not identify at least this one transaction, including not just the parties involved but the disposition of the income generated by that specific deal, so that the Debtor, though an experienced businessman and the Corporations' sole officer and director, could not possibly meet the affirmative obligation to preserve and provide complete records imposed by § 727(a)(3).  *See In re Jacobowitz*, 309 B.R. at 436.  Having omitted this one material transaction, the Debtor's record of the transactions of his Corporations and, per the alter ego doctrine, himself was revealed to be critically incomplete, the whereabouts of at least $80,000 undocumented by any records.  *See In re Joseph*, No. 91-CV-1114, 1992 U.S. Dist. LEXIS 6601, at *14 (N.D.N.Y. Apr. 21, 1992).

Despite this singular example of his records' inadequacy, the Debtor's bookkeeping might still be sufficient if enough information existed in the Debtor's overall record "to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions," as required by § 727(a)(3).  *Schackner*, 2012 U.S. Dist. LEXIS 1001, at *11.  Throughout these proceedings, however, no such definite proof was offered by the Debtor.  Acknowledging that he had no banking records for at least three of the five Corporations, Tr. 9/21/10 at 98:8 10, the Debtor insisted that every other conceivable record had been delivered to his accountant, Mr. Portnoy, who was responsible for "all the ledger work," Tr. 9/21/10 at 134:16–17, and every Corporation's "factoring statements, balance sheets, ledgers . . . the accounting of the entire T&E reports, year-end statements, combined financial statements that had to be issued out," Tr. 9/21/10 at 131:4–5, 8–13.  Rather than clarifying the extent of the Debtor's and Corporations' activities, Mr. Portnoy's testimony only further obfuscated any concrete understanding of the material business transactions of the Corporations and, as such, the

Debtor himself. While the Debtor had stressed that his accountant possessed every invoice regarding the Corporations, Tr. 9/21/10 at 99:2–3, Mr. Portnoy asserted that the invoices sent to him were actually incomplete—"We didn't have all the invoices," and, "We didn't find the purchase invoices," Tr. 11/16/10 at 34:12–13, 80:2—and only partly utilized in his analyses of the Corporations' assets and liabilities, Tr. 11/16/10 at 110:12–21. The Debtor claimed that Mr. Portnoy had drafted every factor statement, but Mr. Portnoy admitted that many, if not all, of the available factor statements had been produced by the Debtor alone. Tr. 11/16/10 at 97:20–98:5. While the Debtor insisted that Mr. Portnoy's ledgers and tax returns were based on concrete documentary support, Mr. Portnoy characterized his ledgers very differently. According to Mr. Portnoy, they were based on neither contemporaneous records nor on such written documents as bills, receipts, and bank statements so familiar to even unsophisticated investors or bankers; instead, he had relied almost entirely on the check stubs that the Debtor dropped onto his desk and on the Debtor's oral descriptions and accounts of the Corporations' transactions, Tr. 9/22/10 at 76:24–25, 77:1–7, 78:1–10, 15–16, 92:18–19, 93:3–5, 93:24–94:1; Tr. 11/16/10 at 87:16– 88:22, and he did not consult the records of the Debtor's alleged part-time bookkeeper, Tr. 9/22/10 at 79:22–25, whose existence he, the Corporations' and Debtor's accountant, questioned before this Court, Tr. 9/22/10 at 21, 24. Even Mr. Portnoy conceded that this excessive reliance on scribbles on a series of check stubs made his ledgers less than ideal as accurate representations of the Corporations' business affairs. Tr. 9/22/10 at 93:3–5; Tr. 11/16/10 at 57:4–5. When questioned, he admitted to doing no more than "generat[ing] a general ledger" containing approximations and estimates, Tr. 9/22/10 at 67:16–17, 68:1–3, and for finding only selectively chosen documentary support for only half of the Debtor's purported sales (totaling $653,000, not $1,342,000), Tr. 11/16/10 at 36:23–25; Tr. 11/16/10 at 86:4–7. In fact, Mr.

Portnoy described his own sampling as small, the Debtor's invoices as incomplete, and his use of these invoices as selective, Tr. 11/16/10 at 108:22–25, 110:12–21, 18 19, and denied undertaking any independent verification or review of the documents provided by the Debtor throughout their association, Tr. 9/22/10 at 76:24–25.  Tellingly, to a single inquiry—"Do you have any empirical evidence?"—Mr. Portnoy answered, "No."  Tr. 9/22/10 at 95: 1–2.  Both then and after, this simple answer undermined the veracity of the documents that Mr. Portnoy had drafted and, as such, the entire financial record tendered by the Debtor in the months before and after filing, for every financial analysis utilized and created by Mr. Portnoy was dependent upon check stubs and the Debtor's word.

"[W]hen certain documents essential to determining a debtor's history are missing," including, as here, "tax returns and the underlying financial records," *Schackner*, 2012 U.S. Dist. LEXIS 1001, at *13, a debtor's records are necessarily "too scant" to provide "an accurate picture [of a debtor's] accounts and finances," *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 56 (E.D.N.Y. 2010).  Accounting for the business affairs of alter egos who were, in law and in fact, the individual Debtor's own was a duty that the Debtor, as an individual, owed the Plaintiffs and the Court.  For all his efforts, by acknowledging that (1) no complete financial statement for a single Corporation has ever been completed, Tr. 9/22/10 at 118:12–14, (2) that no records of monies paid by one factor ever existed, Tr. 11/16/10 at 60:8–12, and (3) that the Debtor's most complete and exhaustive financial account still only incompletely documented the source and direction of the factor financing proceeds, Tr. 11/16/10 at 16:24–17:5, Mr. Portnoy established not the records' sufficiency but their glaring paucity.  In fact, the Debtor had no banking records for three of the five Corporations, Tr. 9/21/10 at 98:8–10; rather than simply failing to maintain a recognizable system of bookkeeping, the Debtor had kept no original books that this Court could

discern.  As such, at trial's end, even though the Debtor needed to account for his alter egos'

profits and losses under § 727(a)(3), the Corporations' revenues and expenses could not be

confidently tracked based on the documentary or testimonial evidence given by the Debtor or

Mr. Portnoy.  Due to this failure to provide adequate records, the Court finds the Debtor has

failed "to make . . . a true presentation" of his financial affairs under § 727(a)(3).  *In re Cacioli*,

463 F.3d at 234 (quoting *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936), *cert. denied*, 299 U.S.

546 (1936)).

### 2.    Justification: Debtor's Burden under § 727(a)(3)

Once the Plaintiffs prove their *prima facie* case, the burden shifts to the Debtor to justify

the absence of comprehensive records under all relevant circumstances.  *E.g.*, *Id.* at 235;

*O'Connor v. Leone (In re Leone)*, 463 B.R. 229, 244 (Bankr. N.D.N.Y. 2011).  The Code does

not include an explicit standard for justification; its acceptability "depends largely on what a

normal, reasonable person would do under similar circumstances."  *D.A.N. Joint Venture v.*

*McCormack (In re McCormack)*, No. 06-1053, 2007 U.S. App. LEXIS 4767, at *3 (2d Cir. Feb.

27, 2007).  As to the credibility of a debtor's "justification," a second test governs: (1) "the

education, experience, and sophistication of the debtor"; (2) "the volume of the debtor's

business"; (3) "the complexity of the debtor's business"; (4) "the amount of credit extended to

debtor in his business"; and (5) "any other circumstances that should be considered in the interest

of justice."  *In re Cacioli*, 463 F.3d at 237 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1231

(3d Cir. 1991)).  A debtor who claims business acumen and sophistication cannot justify a dearth

of record-keeping by "merely stating that he did not comprehend the need for them or that it was

not his practice to keep business records."  *In re Moreo*, 437 B.R. at 52 (quoting *Bay State*

*Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 997 (Bankr. N.D. Ill. 1992)).  A debtor's

stated justification will still satisfy § 727(a)(3) if enough evidence exists "to convince the court of the debtor's good faith and businesslike conduct."  *In re Joseph*, 1992 U.S. Dist. LEXIS 6601 at *13–14.

Here, the Court finds that the Debtor's stated justification does not meet this burden because his conduct is not "what a normal, reasonable person would do under the circumstances."  *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 332 B.R. 514, 518 (D. Conn. 2005) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1991)).  A reasonable and experienced corporate executive and owner does not keep the books of his Corporations incomplete, as the Debtor did according to the accountant for his every Corporation.  Tr. 9/22/10 at 142:18–19.  A reasonable and honest person does not manufacture ledgers documenting his defunct businesses' past activities years after their apparent demise, as the Debtor asked his accountant to do, in his efforts to defeat an objection to discharge.  Tr. 9/22/10 at 89:11–17.  Such *ex post facto* data, essentially based on unsupported oral accounts and an accountant's minimal questioning, throws into doubt the Debtor's good faith and professional conduct and hence his justification for surrendering these inadequate records.  *Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Bernard (In re Bernard)*, 99 B.R. 563, 571 (Bankr. S.D.N.Y. 1989); *Filmar, Inc. v. White (In re White)*, 63 B.R. 742, 745 (Bankr. N.D. Ill. 1986).  "When the records fail to explain business transactions whereby a large shrinkage of assets results," moreover, "a discharge should be refused upon the ground of failure to keep proper books and records."  *Office of Comptroller Gen. of Republic of Bolivia v. Tractman*, 107 B.R. 24, 26 (S.D.N.Y. 1989) (quoting 4 COLLIER ON BANKRUPTCY ¶ 727.03 (15 ed. rev. 2008)).  Vague and general oral assertions that the records are no longer available will not suffice, *In re Joseph*, 1992 U.S. Dist. LEXIS 6601 at *11, and it is equally insufficient for the debtor to supplement the missing

documentary information through oral testimony under § 727(a)(3), *Micro Connections, Inc. v. Shah (In re Shah)*, 388 B.R. 23, 32 (Bankr. E.D.N.Y. 2008) (citing *In re Sethi*, 250 B.R. at 839)). As previously discussed, *see* Discussion, section IV.B.1, the Debtor directed this Court to his accountant, but Mr. Portnoy both conceded that his records of the Corporations' activities were incomplete and acknowledged that the documents that he had offered the Plaintiffs on the Debtor's behalf were based not on a complete canvass but on less than a dozen check stubs, the Debtor's oral representations, and a handful of invoices drawn from nearly twenty boxes allegedly filled with dispositive records that neither he nor the Debtor would identify precisely. Tr. 2/3/11 at 100:12–16; Tr. 9/22/10 at 26:6–9; 48:2–6, 44:24–25.  As such, by the end of the Alter Ego Trial, the Debtor had proffered no definitive written evidence "made and preserved from which his present financial condition as well as business transactions for a reasonable period of time in the past may be ascertained." *Tractman*, 107 B.R. at 26 (quoting *In re Underhill*, 82 F.2d at 260) ("The complete disclosure requirement of *In Re Underhill* extends to all material business transactions of the debtor, including those pertaining to another's property, such as trust property or promissory notes.").  Having not yielded "complete and accurate information showing what property has passed through . . . [his] hands during the period prior to his bankruptcy," *Frehm v. Harron (In re Harron)*, 31 B.R. 466, 469 (Bankr. D. Conn. 1983) (quoting *In re Devine*, 11 B.R. 487, 488 (Bankr. D. Mass. 1981) (citations omitted)), the Debtor has not met the minimal obligation encoded in § 727(a)(3) "to reveal, rather than conceal, the complete financial picture," *Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 324–25 (Bankr. E.D.N.Y. 2005) (internal quotation marks omitted) (citing *In re Sethi*, 250 B.R. at 838).

Three other factors vitiate the viability of the Debtor's "justification."  First, a debtor cannot defend his records' inadequacy by hiring "an accountant to reconstruct the debtor's

records based primarily upon the accountant's estimates of the debtor's business activities." *In re Joseph*, 1992 U.S. Dist. LEXIS 6601, at *9–10 (quoting *Wortman v. Ridley (In re Ridley)*, 115 B.R. 731, 735 (Bankr. D. Mass. 1990)). Here, the Debtor propounded such a defense. According to Mr. Portnoy, he prepared the Corporations' tax returns specifically in connection with the Debtor's bankruptcy case and drafted the factor statements and ledgers based on these already tainted returns. Tr. 9/22/10 at 82:5–9, 89:11–17; Tr. 11/16/10 at 18:12–15. In short, every return, factor statement, and ledger was a post-petition reconstruction based on Mr. Portnoy's subjective post-petition analysis. Tr. 9/22/10 at 77:9–13, 76: 24–25. In addition, a debtor cannot "simply place sacks of records before the judge or trustee to sift through the documents and attempt to reconstruct the flow of the debtor's assets." *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993). The Debtor did exactly that in November 2010, giving Mr. Portnoy no less than fourteen boxes from which he could find supporting documentation for a single schedule. Tr. 11/16/10 at 82:6–10. It was this disorganized heap that the Debtor then invited the Plaintiffs and this Court to review. Tr. 11/16/10 at 148:8–25. Earlier, in anticipation of his filing, the Debtor apparently did the same with another set of boxes, boxes that purportedly contained the Debtor's only records of how the alter ego Corporations—and therefore he as individual—disposed of $3.3 million in assets. As Mr. Portnoy described it, the Debtor "just had boxes of documents and he was basically pulling them out." Tr. 9/22/10 at 84:8–10. Since no confirmed independent verification of a source document has yet been submitted, Tr. 11/16/10 at 82:6–10, in contending that Mr. Portnoy's financial analyses are credible records of his and his alter egos' business dealings, the Debtor is asking this Court to accept as accurate the Debtor's own description of the content of the only records, still undifferentiated, that remain for anyone's perusal. Finally, the Debtor's delay in

producing these relevant documents also weighs against his justification.  *See Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 356 (4th Cir. 2007) ("Whether the timeliness of a debtor's disclosure of records caused a delay for the parties in adequately ascertaining his financial condition is a factor that a trier of fact may assess.")  As one court recently observed, a debtor's delay cannot be easily be excused as to records that were kept in a basement and in two filing cabinets, regardless of whether he claims to have otherwise thoroughly searched for such records.  *In re Shah*, 388 B.R. at 37.  In the Debtor's own words, his belatedly tendered records were in a filing cabinet in the back of his garage.  Tr. 11/16/10 at 148:8–9.  After he had failed to proffer objective books, records, and papers from which the financial condition and business transactions of each Corporation could be confidently discerned soon after filing, the Debtor had to surrender recorded information, including books, documents, records and papers, sufficient to verify his financial condition or business transactions.  Instead, by the Alter Ego Trial's last day, he had presented an explanation, undermined by his sole witness and linked to no specific written evidence, as to what his records allegedly depicted;[6] § 727(a)(3) mandates a far fuller picture for a discharge to be merited.

### 3.    Conclusion: § 727(a)(3)

Because the Debtor could not justify the dearth of records from which the Corporations' business transactions, and hence his own dealings, may be confidently discerned, this Court denies the Debtor's discharge pursuant to § 727(a)(3).

### C.    *Failure to Explain Loss of Substantial Assets: § 727(a)(5)*

Section 727(a)(5) provides the basis to deny a discharge if "the debtor has failed to

---

[6]    The Debtor did, at one point, blame his inadequate records on the destruction of his computer.  Tr. 11/16/10 at 143:11–15.  Regardless, even if true, the computer's loss did not absolve the Debtor of the obligation to organize the records that he did possess.

explain satisfactorily, before determination of denial of discharge under this paragraph, any loss

of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  The

purpose of this section is to deter and punish debtors from "abus[ing] the bankruptcy process by

obfuscating the true nature of their affairs, and then refusing to provide a credible explanation."

*Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 317 (Bankr. S.D.N.Y. 1994) (citing *In re Johnson*,

98 B.R. 359, 366 (Bankr. N.D. Ill. 1988)).  Like § 727(a)(3), this paragraph contains no intent

requirement and creates a two-part burden-shifting analysis.  *In re Cacioli*, 463 F.3d at 238.[7]

### 1.    Missing Assets: Plaintiffs' Burden under § 727(a)(5)

To carry the initial evidentiary burden under § 727(a)(5), a plaintiff must establish three

elements: (1) that a debtor at one time possessed or claimed to control substantial and

identifiable assets; (2) that those assets have disappeared, their disposition or placement now

unknown; and (3) that no plausible explanation for this deficiency is apparent from the submitted

records or has been articulated by the debtor.  *See, e.g.*, *Adams v. Inzero (In re Inzero)*, 426 B.R.

428, 432 (Bankr. D. Conn. 2009) (citing *In re Cacioli*, 463 F.3d at 238; *Jiminez v. Rodriguez (In

re Rodriguez)*, No. 05-19599, 2008 Bankr. LEXIS 4598, at *7–8 (Bankr. S.D.N.Y. 2008)

(quoting 6 COLLIER ON BANKRUPTCY ¶ 727.08 (15th ed. rev. 1995)).

In this case, as the Debtor and Mr. Portnoy testified, the Corporations accumulated

substantial assets, at least $3.3 million, from various factoring agreements. Tr. 9/21/10 at 77:12–

17; Tr. 11/16/10 at 18:8–19, 20:2–7.  Documentary proof for this sum originally appeared in

eight exhibits submitted by the Plaintiffs, Pls.' Ex. No. 43–50.  These exhibits, showing that the

Corporations had $2.2 million remaining after a partial payment of $1.1 million to the Plaintiff,

---

[7]    Since a case for an objection under § 727(a)(5) often requires a plaintiff to make allegations closely related
to those necessary to support an objection made pursuant to § 727(a)(3), the Instant Decision discusses §
727(a)(5) out of turn, before § 727(a)(4)(A).

were left uncontroverted by the Debtor, and they provide more than sufficient evidence that the

Corporations and hence the Debtor held and controlled sizable assets prior to the Debtor's filing.

During the Corporations' existence, the Debtor's own assets had thus been dispensed, yet

complete and accurate records of their disposal, though repeatedly sought by the Plaintiffs'

counsel, had never been surrendered.  Tr. 9/22/10 at 162:13–19, 160:20–23; Tr. 11/16/10 at 29:8,

18:8–19.  By proving that the Corporations had once held substantial assets and that records of

their dissipation had been requested, the Plaintiffs met their burden under § 727(a)(5).  *E.g.*,

*Buckeye Ret. Props. of Ind., LLC v Tauber (In re Tauber)*, 349 B.R. 540, 564–65 (Bankr. N.D.

Ind. 2006); *Comerica Bank v. Bressler (In re Bressler)*, 321 B.R. 412, 417–19 (Bankr. E.D.

Mich. 2005).

### 2.      Satisfactory Explanation: Debtor's Burden under § 727(a)(5)

Once a plaintiff has made his or her three-part *prima facie* case, the debtor must supply a

"satisfactory" explanation for the failure to account for the missing assets.  *Sonders v. Mezvinsky

(In re Mezvinsky)*, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001).  On this question of fact, "the

standard is one of reasonableness and credibility."  *Minsky v. Silverstein (In re Silverstein)*, 151

B.R. 657, 663 (Bankr. E.D.N.Y. 1993).  To be satisfactory, a debtor's explanation must only

"convince the bankruptcy judge that a debtor has not hidden or improperly shielded assets."

*First Am. Bank v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 29–30 (Bankr. E.D.N.Y. 1994);

*accord Pereira v. Young (In re Young)*, 346 B.R. 597, 618 (Bankr. E.D.N.Y. 2006).

In this case, however, the Debtor provided no such satisfactory explanation as to the

disappearance of the proceeds of the Corporations' factor financing.  In his testimony, the Debtor

blamed "overhead" and "chargebacks."  Tr. 9/21/10 at 80:21, 114:7–10.  Mr. Portnoy would

employ the same undefined term—"overhead"—and repeat this explanation even as he

acknowledged that the Corporations, and therefore the Debtor, received goods for which no payment was tendered as he had personally promised.  Tr. 9/22/10 at 26:6–9.  When both witnesses were pressed, neither could provide any substantial details or corroborating evidence.  Instead, Mr. Portnoy admitted that much of his financial documentation regarding the Corporations and the Debtor was incomplete: "We didn't have all the invoices. We just had a bunch of them," Tr. 11/16/10 at 34:12–13, only half in fact, Tr. 11/16/10 at 38:24–25.  As for "the chargebacks" and "overhead" which allegedly consumed the Corporations' assets and which Mr. Portnoy purportedly itemized in Exhibit T, the latter witness could point to no document from which he had derived his figures.  He fingered check stubs—but could not point to or show one particular paper stub—and had relied almost exclusively on the Debtor's representations.  Tr. 9/22/10 at 45:12–16.  Even "the general ledger" had only been "generated" post-petition based on scattered records and the Debtor's oral representations as to the alter ego Corporations' operations. Tr. 9/22/10 at 67:16–17, 68:1–3; 78:1–10, 15–16, 49:7–8, 90:19–20.  As with § 727(a)(3), to defeat this § 727(a)(5) objection, the Debtor had to provide more than vague and unsupported indefinite explanations of losses, themselves based on uncorroborated estimates, like "overhead" and "chargebacks."  *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).  Rather than such "general oral explanation[s] for the disappearance of substantial assets," *Turner v. Tran (In re Tran)*, 297 B.R. 817, 836 (Bankr. N.D. Fla. 2003), the Debtor needed to supply evidence "sufficient to eliminate the need for *any* speculation as to what happened to all of the assets," *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005) (emphasis added).  In this case, the Debtor insisted that the Court would find corroboration for his assertions in Mr. Portnoy's testimony, but during three days of testimony Mr. Portnoy could not provide any definitive support, as he had mostly relied on the Debtor's words and

scattered stubs.  For these reasons, despite all the exhibits submitted and all the testimony heard, this Court cannot state with confidence what happened to the millions of dollars held by the Corporations, and the Debtor has therefore not credibly explained the whereabouts of the Corporations' and hence his own assets.

### 3.    Conclusion: § 727(a)(5)

The Plaintiffs have sustained their burden of proving a loss of assets by the Debtor, and the Debtor has failed to provide a satisfactory explanation for such loss.  This Court must thus deny his discharge pursuant to § 727(a)(5).

### D.    *False Oaths and Accounts: § 727(a)(4)(A)*

Pursuant to § 727(a)(4)(A), a court may not discharge a debtor if he or she "knowingly and fraudulently, in or in connection with the case, made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  For this objection, a plaintiff must prove five elements by a preponderance of the evidence: (1) "the debtor made a statement under oath"; (2) "the statement was false"; (3) "the statement related materially to the bankruptcy case"; (4) "the debtor knew the statement was false"; and (5) "the debtor made the statement with fraudulent intent."  *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 572 (E.D.N.Y. 2000); *accord Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000).  "[O]nce the objecting creditor has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation."  *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 662–63 (Bankr. S.D.N.Y. 2008) (citing *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005)).

### 1.    False Oaths and Material Matters: Plaintiffs' Burden under § 727(a)(4)(A)

A debtor's petitions and schedules can amount to statements under oath for purposes of § 727(a)(4)(A) (first factor). *In re Gannon*, 173 B.R. at 320; *see also Protos v. Silver (In re Protos)*, 322 Fed. Appx. 930, 933 (11th Cir. 2009). A statement is false if (1) it omits even one asset or source of income; (2) necessarily material information is repeatedly left undisclosed during a case's pendency; or (3) an affirmative misstatements is made and is not corrected during an examination or at any point during his case's proceeding. *See, e.g.*, *Burgos v. Pergament*, No. 11-CV-5257 (JFB), 2012 U.S. Dist. LEXIS 128501, at *27 (E.D.N.Y. Sept. 10, 2012); *Republic Credit Corp. I v. Boyer (In re Boyer),* 367 B.R. 34, 45 (Bankr. D. Conn. 2007), *aff'd,* 384 B.R. 44 (D. Conn. 2008). A material matter is "one bearing a relationship to the debtor's business transactions or estate or which would lead to the discovery of assets, business dealings or existence or disposition of property." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228–29 (E.D.N.Y. 2000); *accord Mick v. Bricker (In re Mick)*, 310 B.R. 255, 261 (D. Vt. 2004). One single false oath or account is sufficient to deny a debtor's discharge. *TD Bank, N.A. v. Nazzaro (In re Nazzaro)*, No. 810-74869, 2013 Bankr. LEXIS 177, at *18–19 (Bankr. E.D.N.Y. Jan. 13, 2013).

In answer to questions in the Petition, the schedules, and the Statement of Financial Affairs (the "SOFA"), the Debtor should have listed—but did not—the following critical data about his financial status: his wife's checking account into which his income was deposited; his income from 2002, 2003, and 2004; his ownership stake in the Corporations; and his status as a defendant in the state court proceeding. Instead, though the Debtor admitted to depositing his income in either his Corporations' or his wife's bank accounts, Tr. 9/20/10 at 78:6–9, 79:13–22, 81:13–15, and that he dictated how these funds were distributed by either the Corporations or Ms. Speiser, Tr. 9/20/10 at 80:16–19, the Debtor mentioned only one account of any kind, an

"IRA" worth between $7,500 and $12,500, in response to Question B2 in Schedule B. Dr.'s Pet., Sched. B. In his defense, the Debtor insisted, "I don't own her bank account," Tr. 9/20/10, at 80:25. In response to Question 10, mandating that the Debtor "list all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case," the SOFA says "none," Dr.'s Pet., SOFA. However, reading from his deposition, the Debtor admitted at trial that this statement was not true. Tr. 9/20/10 at 128:2–4. These same inconsistencies characterize the Debtor's representation as to his income: while he listed no income in Schedule I and claimed to have earned no income in 2002 and 2003 in his SOFA, the Debtor did list income of $36,000 in the Summary of Schedule and testified before this Court that he earned income in 2002 and 2003. Dr.'s Pet., Sched. I & Summ.; Tr. 9/20/10 at 102:20–21, 120:24–25; Dr.'s Pet., SOFA; Tr. 9/20/10 at 119:22–25; Tr. 9/21/10 at 136:13, 19. In response to Question B12, requiring that the Debtor *itemize* "stock and interests in incorporated and unincorporated businesses," the Petition reads, "See list attached," Dr.'s Pet., Sched. B, yet no list was appended, Tr. 9/20/13 at 59:13–25, 88:6–10, despite the Debtor's 100% ownership stake in each alter ego Corporation. To the SOFA's eighteenth question, asking the Debtor to list the companies for which he was an officer or director within the last six years, the Debtor answered "none." Patently false at filing, the Debtor admitted as much when he testified before this Court. Dr.'s Pet., SOFA; Tr. 9/20/10 at 29:3–8. Finally, as to Question 4 in his Schedule B, the Debtor failed to state that he was a party to any lawsuit, yet he had been a defendant in the Plaintiffs' state court action until he filed. Tr. 9/20/10 at 113:21–23, 117:12–13. As the Debtor concedes, his papers were filled with these and other "mistakes" regarding material matters, including false statements as to his cash on hand, Tr. 9/20/10 at 75:3–8, and to

the assets in his home that he once owned, Tr. 9/20/10 at 85:14–16. [8] Tr. 11/16/10 at 132:18–20,

133:4–7; Tr. 9/20/10 at 63:6–7, 70:18–19.  As such, the Debtor repeatedly failed to disclose or

misrepresented material information about his individual assets and financial affairs, action that

§ 727(a)(4)(A) was designed to deter—and to punish.  *See, e.g.*, *Retz v. Samson (In re Retz)*, 606

F.3d 1189, 1197–98 (9th Cir. 2010); *Palatine Nat'l Bank of Palatine v. Olson (In re Olson)*, 916

F.2d 481, 484 (8th Cir. 1990).

　　While the Debtor should have included the liabilities *and* assets of the Corporations as his

own in his bankruptcy petition and schedules, the Debtor's inconsistent inclusion of the

Corporations in his individual bankruptcy petition was self-serving and selective.  For example,

in his Schedule E, the Debtor listed "Tsinlein Garment" as a creditor with a claim of $550,000.

This debt is seemingly business in nature, yet as the Debtor reminded the Court, he filed

bankruptcy as an individual, not as a corporation, Tr. 9/20/10 at 116:3–8; Tr. 11/16/10 at

136:17–18, 23–25, and signed no personal guarantee as to any of his business debt.  As to other

corporate creditors, the Debtor consistently professed his lack of personal liability even as he

itemized that liability in his petition.  Tr. 9/20/10 at 91:23–24, 16–17, 92:22–93:3, 96:1–3,

96:16–18, 97:14–16, 98:12–16.   Concurrently, although he made sure to list these liabilities, he

made no mention of a single corporate asset in his filed paperwork.  Although all the assets and

liabilities of his alter egos were his own assets and liabilities, the Debtor chose to list only the

*liabilities*, presumably hoping to gain a discharge of those debts.  It is the Debtor's inconsistency

in claiming and omitting such assets, reflecting a willingness to identify the Corporations'

liabilities as his own in one schedule yet omit the Corporations' assets from another, that

---

[8]　　The Debtor attached the first corrected versions of his petition and schedules to papers submitted in opposition to the Plaintiffs claims in this case.  Tr. 9/20/10 at 62:24, 12–14.  *Cf. Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294–95 (10th Cir. 1997) (finding that rectifying omissions, if done "very early" and of a debtor's "own accord," may disprove intent).

highlights the self-serving falsities repeated in his papers.

In sum, the Debtor again and again propounded answers that obscured his financial status and transfers to which he had been a party, as well as a critical fact: that he, as an individual and in the guise of his alter ego Corporations, held some legal and equitable property interests not disclosed in sworn oaths and accounts.  It is this repetition of the same *inconsistencies* in his filed papers that reveals the Debtor's disregard for his duties as a debtor and as a corporate principal. The Plaintiffs' efforts revealed some, if not all, of the Debtor's property, but § 727(a)(4)(A) is "intended to ensure that adequate information is available to those interested in the administration of the bankruptcy estate *without* the need of examinations or investigations to determine whether the information is true."  *In re Gollomp*, 198 B.R. at 437 (emphasis added) (quoting *Friedman v. Kaiser (In re Kaiser)*, 94 B.R. 779, 781 (Bankr. S.D. Fla. 1988)).  As the Debtor only provided an incomplete and inaccurate picture of his financial affairs, this Court finds that the Plaintiffs have met their burden under § 727(a)(4)(A).

## 2.    Fraudulent Intent: Parties' Shared Burdens under § 727(a)(4)(A)

As long as a debtor either proffered "false" information or omitted critical information with "the purpose of perpetrating a fraud" or to deceive his creditors, he or she both "knowingly" and "fraudulently . . . made a false oath or account."  *In re Moreo*, 437 B.R. at 62; *accord In re Diodati*, 9 B.R. at 807–08.  This intent can be shown by either (1) evidence of a debtor's actual intent to deceive or (2) indicia of his reckless indifference to the truth, *In re Adler*, 395 B.R. at 843; *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001), *cert. denied*, 534 U.S. 1042 (2001).  Proof of "an actual intent to deceive" comes from the same ten badges of fraud used in the intent analysis mandated by § 727(a)(2)(A).[9]  *Martin v. Key Bank of*

---

[9]    These badges were discussed earlier in the Instant Decision. *See* Discussion, section III.A.3.

*New York (In re Martin)*, 208 B.R. 799, 806 (N.D.N.Y. 1998) (quoting *United States v. Coppola*, 85 F.3d 1015, 1021 (2d Cir. 1996)). The second means of proving fraudulent intent—"reckless indifference to the truth" or "a cavalier disregard of the truth"—is unique to § 727(a)(4)(A). *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011); *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009). To prove intent under this reckless disregard standard, courts consider the following three non-exclusive factors: (a) "the serious nature of the information sought and the necessary attention to detail and accuracy in answering," *Wisell v. Wisell (In re Wisell)*, No. 2:06-CV-167-WKS, 2007 U.S. Dist. LEXIS 64011, at *8 (D. Vt. Aug. 28, 2007) (internal quotation marks omitted) (citing *Sanderson v. Ptasinski (In re Ptasinski)*, 290 B.R. 16, 22–23 (Bankr. W.D.N.Y. 2003)); (b) a debtor's "lack of financial sophistication" as evidenced by his or her professional background, *Pergament v. Derise (In re Derise)*, No. 07-CV-3083 (JFB), 2008 U.S. Dist. LEXIS 91853, at *27–28 (E.D.N.Y. Mar. 27, 2008) (commending the bankruptcy court for considering "a lack of financial sophistication . . . in determining, in the first instance, whether the Debtor had fraudulent intent at all"); and (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies, *e.g.*, *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862–63, 863 n.3 (5th Cir. 2004); *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr. D. Md. 1982) ("[N]o carelessness could excuse the Debtor's failure to amend his schedules promptly when he had the leisure to do so."). Assuming a plaintiff has met his burden by producing persuasive evidence of a false statement, a debtor's explanation must disprove either the relevant badges or accumulated indicia of his reckless indifference to disprove a plaintiff's *prima facie* § 727(a)(4)(A) case. *In re Moreo*, 437 B.R. at 60; *see also In re Kaiser*, 722 F.2d at 1584 n.4.

In his attempts to portray the errors in his oaths as innocent mistakes, the Debtor
attributed the blame to his prior counsel's efforts and advice and disclaimed any responsibility
for his lawyer's errors.  Tr. 9/20/10 at 72:15, 116:22–24 (as to Schedules I and J), 117:9–13,
131:5–6 (as to SOFA); Tr. 11/16/10 at 132:18–20, 133:4–7.  Although the courts do not
uniformly endorse the use of this defense for purposes of § 727(a)(4)(A), advice of counsel may
sometimes "provide an excuse for an inaccurate or false oath," albeit not a fraudulent one.
*Georges v. Georges (In re Georges)*, 138 Fed. Appx. 471, 472 (3d Cir. 2005) (quoting *In re
Topper*, 229 F.2d 691, 692 (3d Cir. 1956)).  Advice of counsel, however, will not serve as a
defense when "it is transparently plain that the property should be scheduled."  *In re Dubrowsky*,
244 B.R. at 573. It will also not save a debtor who has failed to produce "the serious information
sought" and to show "the attention to detail and accuracy in answering" expected of a similarly
situated person.  *In re Wisell*, 2007 U.S. Dist. LEXIS 64011 at *8.  "[A] well-educated, long-
experienced and sophisticated businessman" is expected to answer with more care and accuracy
than a financially unsophisticated one, *Maring v. PG Alaska Crab Inv. Co.*, 338 Fed. Appx. 655,
658 (9th Cir. 2008).  If a person similar to the Debtor would regard the misrepresented or
omitted information as "plain, palpable and transparent fact[s]" to be scheduled and disclosed,
*Barnett Bank of Tampa, N.A. v. Muscatell (In re Muscatell)*, 113 B.R. 72, 75 (Bankr. M.D. Fla.
1990), the inference of fraudulent intent raised by a debtor's false papers will not be rebutted by
a reliance-on-counsel defense.

The Court finds that the Debtor's "advice of counsel" defense is insufficient to meet the
burden established in § 727(a)(4)(A).  When questioned about his Corporations' finances, the
Debtor answered, "I'm not a financier. I'm not an accountant." Tr. 2/3/11 at 127:16–17.  Yet, his
testimony establishes his multi-decade career in the garment industry, Tr. 9/20/10 at 34:1–37:16,

experience which necessarily imparts a certain level of financial sophistication and business experience.  Equally worthy of note, the Debtor claimed intimate knowledge of factor financing, as he had chosen that means of supplying working capital for each Corporation, Tr. 9/20/10 at 50:10–13, 53:24–54:1, 164:6–16, and to understand the nuances of limited liability, Tr. 2/3/11 at 54:11–13, 56:11–13, 21–24, 113:5–7.  Not by "accident" but by choice, he listed the Corporations' creditors as his own even though he considered the Corporations to be separate from his own person.  Tr. 9/20/10 at 117:12–13.  This belies his own contention that he thought himself insulated by the doctrine of limited liability and could not comprehend the requirement that he identify any corporations in which he served as an officer or director in the SOFA, Tr. 9/20/10 at 129:3–8, and any corporation in which he owned stock in Schedule B, Tr. 9/2010 at 88:6–10.  A person who, like the Debtor, had served as the head of multiple corporations, including the Corporations here, negotiated multiple international contracts for the sale of goods, and so persistently distinguished between "I personal" and "I as a corporation" would have realized the misleading nature of his statements and omissions.  It defies reason to believe that this longtime businessman would have misunderstood the Schedules' and SOFA's plain directives.  Finally, there are those questions that require no advance degree to comprehend and that a person who had previously filed a bankruptcy petition and obtained a discharge, as the Debtor had done once before, would not readily misapprehend.  For instance, the Debtor knew himself to be a litigant, knew himself to have earned income and been employed, knew himself to be an officer of five corporations, and knew himself to have transferred Corporate funds and his ostensibly individual income to an account held in his wife's name.  Most definitively, despite this knowledge, the Debtor here withheld that information from his signed Petition, SOFA, and Schedules.  Dr.'s Pet., SOFA; Pls.' Ex. 51; Tr. 9/20/10 at 102:20–21, 113:21–23,

119:22–25, 120:24–25, 123:19–124:1, 128:2–4; Tr. 9/21/10 at 136:13, 19.  The questions that the Debtor erroneously answered thus concerned no abstruse area of law of which the Debtor was unaware; instead, each question concerned a factual occurrence of which the Debtor was a full participant and for which no legal acumen was required to answer as truthfully or consistently as the Code requires.  As such, advice of counsel cannot refute the inference of fraud raised by the Debtor's numerous omissions and untruths.  *See In re Dubrowsky*, 244 B.R. at 573.

Beyond this reliance on counsel argument, this Court only has the Debtor's assertion that he did not fraudulently omit or misrepresent many of his now known property interests.  With no significant probative evidence to support his position, such self-serving statements are insufficient to counter the inference raised by the Plaintiffs' *prima facie* case.  *See, e.g.*, *Sicherman v. Rivera (In re Rivera)*, No. 06-8013, 2007 Bankr. LEXIS 26, at *18–19 (B.A.P. 6th Cir. Jan. 11, 2007); *Solomon v. Barman (In re Barman)*, 237 B.R. 342, 351 (Bankr. E.D. Mich. 1999).  To disprove it, the Debtor had to propound some persuasive explanation for their profusion in his papers.  In choosing to blame his counsel for not listing property that he, as a previous filer and president of nearly ten corporations over a period of three decades, should have seen as essential to disclose for any creditor to attain.  Section 727(a)(4)(A) mandates a debtor provide "adequate information . . . without the need of examinations or investigations to determine whether the information is true," *In re Gollomp*, 198 B.R. at 437, but the Debtor never provided such evidence or even a credible explanation for his failure to do so, the minimum required by § 727(a)(4)(A), *e.g.*, *In re Murray*, 249 B.R. at 228 (quoting *id.*); *In re Gardner*, 384 B.R. at 662.  The Court finds that the Plaintiffs have satisfied their burden of proving that the Debtor did not provide such information.

### 3.    Conclusion: § 727(a)(4)(A)

As the Debtor knowingly made a false oath and account and did not rebut the inference of fraudulent intent raised by his numerous inaccuracies and omissions, this Court holds that the Plaintiffs have proven § 727(a)(4)(A) by a preponderance of the evidence.

## <u>CONCLUSION</u>

For all its intricate complexity, the Bankruptcy Code incorporates many common-law principles, including the veil-piercing and alter ego doctrines.  These doctrines have affected the Debtor here, and indeed may affect any individual debtor under the Code, in at least two ways. First, pursuant to § 362(a)(1), as construed in *Queenie* and *Robins*, the stay triggered by the Debtor's filing automatically foreclosed any judicial action against the non-debtor Corporations as of July 28, 2004, and the New York Supreme Court's post-petition decision against the Corporations was therefore void.  Second, due to the factual predicates found in this Court's alter ego ruling, the Debtor had to account for the assets and records of the Corporations to avoid contravening § 727(a) and to earn the privilege of a general discharge.  Specifically, the Debtor needed to have neither concealed nor destroyed the Corporations' property, as it was "property of the debtor"; he must have preserved records of their financial transactions, as those transactions were essential to ascertaining "the debtor's financial condition or business transactions"; he must have satisfactorily explained the loss of assets sufficient to meet their debts to the Plaintiffs, as these were "the debtor's liabilities"; and he must have disclosed or, at worst, only innocently omitted property and liabilities in his and the Corporations' names from his sworn statements, as any knowing and fraudulent omission of this financial data as to the Corporations was an omission of Debtor's financial past as an individual.

Accordingly, this Court will deny the Debtor's discharge pursuant to §§ 727(a)(2)(A),

(a)(3), (a)(4)(A), and (a)(5).  An order and judgment consistent with the Instant Decision shall be entered forthwith.


Dated:    Central Islip, New York
          July 11, 2013                    _/s/ Robert E. Grossman_
                                           The Honorable Robert E. Grossman
                                           United States Bankruptcy Judge